IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AUGUSTINE GUTIERREZ, *an*
*incapacitated adult, through his conservator,*
guardian and mother, JANE GUTIERREZ;
JANE GUTIERREZ, *an individual;*
PETER GUTIERREZ, *an individual;* and
JAMIE GUTIERREZ, and JADA GUTIERREZ,
*minor children, through their parent and guardian,*
ANDREA GUTIERREZ,

        Plaintiffs,

v.                                           CIV 08-0990 KBM/LAM

BOARD OF COMMISSIONERS OF THE
COUNTY OF EDDY, *a body politic;*
BEATE DENNINGER, *in her individual and official*
*capacities as a detention officer with the Eddy County Detention Center;*
SHIRLEY RODRIGUEZ, *in her individual and official*
*capacities as a detention officer with the Eddy County Detention Center;*
MIGUEL JAURE, *in his individual and official*
*capacities as a detention officer with the Eddy County Detention Center;*
RHONDA BRYANT, *in her individual and official*
*capacities as a  nurse with the Eddy County Detention Center;*
CITY OF ARTESIA, NEW MEXICO, *a municipality;* and
MARTIN MARTINEZ, *in his individual capacity only as a police officer*
*with the Artesia Police Department,*

        Defendants.

# <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER involves Augustine Gutierrez' attempted suicide when he was a pretrial

detainee at the Eddy County Detention Center ("ECDC").  In an earlier decision, I denied

summary judgment for Defendant Beate Denninger finding that "clearly established law put [her]

on notice that deliberate failure to address a known risk of suicide would violate an inmate's

constitutional rights, and . . . because the evidence could suggest that may have occurred, she is

not now entitled to qualified immunity." *Doc. 59* at 6.

Now with further amendments to Plaintiffs' complaint and the addition of other parties, more Defendants have now filed motions for summary judgment. *See Docs. 74, 112*. Those Defendants include: (1) the "Artesia Defendants" (police officer Martin Martinez and his employer the City of Artesia) responsible for the transfer of Augustine Gutierrez to ECDC just before midnight on May 22, 2008 where Sergeant Denninger handled his intake and assigned him to the general population; and (2) the remaining individual "Eddy County Defendants" (ECDC nurse Rhonda Bryant and detention officers Miguel Jaure and Shirley Rodriguez) who interacted with Gutierrez during his stay, including the day of May 25, 2008 when he attempted suicide. Unsuccessful in his attempt, Gutierrez remains in a coma, existing in a vegetative state.

Both sets of defendants maintain that undisputed facts fail to support a constitutional violation and, alternatively, that the individual defendants are entitled to qualified immunity; the Artesia Defendants also maintain that they are also entitled to summary judgment on any claim based upon state law. *See Doc. 74* at 2; *Doc. 112* at 5, 12. The Court has carefully reviewed the motions, the memoranda and exhibits submitted by the parties, and the relevant authorities. I find that oral argument is unnecessary for my ruling.

For the reasons below, I find that the undisputed facts establish that the Artesia Defendants did not act with "deliberate indifference" nor could their actions be deemed a legal "proximate cause" of the attempted suicide. On the other hand, the evidence submitted by the Plaintiffs creates a material issue of fact as to whether the individual Eddy County Defendants consciously engaged in conduct that could be found by a jury to be "deliberately indifferent" to Gutierrez' constitutional rights as a pretrial detainee and the proximate cause of his injuries. I

2

further find that they are not entitled to qualified immunity because it was clearly established at the time that such conduct would amount to a constitutional violation.

## Legal Standards

As I previously found, pretrial detainees are entitled to Fourteenth Amendment[1] protection against "deliberate indifference" to "serious medical needs."  *Doc. 59* at 3-4  (citing *Gaston v. Ploeger*, 229 Fed. App'x. 702 (10th Cir. 2007) ("*Gaston I*") and *Gaston v. Ploeger*, 297 Fed. App'x 738, 741-42 (10th Cir. 2008) ("*Gaston II*") (appeal following proceedings after remand in *Gaston I*); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  Deliberate indifference consists of two components –  one subjective and the other objective.  "The objective component of the test is met if the harm suffered was sufficiently serious.  Obviously suicide satisfies this requirement."   *Gaston II*, 297 Fed. App'x at 741-42 (citation omitted).  Thus, if a detention center employee is aware of circumstances indicating an inmate's inclination to attempt suicide, the objective component of the "deliberate indifference" test is met.

As for the subjective component of the test, a recent Tenth Circuit decision summarized the law in this area.

> "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Callahan,* 471 F.3d at 1159 (internal quotation marks omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk

---

[1]  Under the Fourteenth Amendment, a pretrial detainee has the same level of protection when it comes to medical attention as a convicted inmate has under the Eighth Amendment.  *See Garcia v. Salt Lake Co.*, 768 F.2d 303, 307 (10th Cir. 1985).

of serious harm exists, and he must also draw the inference." *Farmer [v. Brennan]*, 511 U.S. at 837.  Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference.  The question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"  *Mata*, 427 F.3d at 753.

> The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or "from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842.  However, the Supreme Court has cautioned that an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because "a prison official may show that the obvious escaped him."  *Id.* at 843 n. 8.

> Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner.  Our decision in *Estate of Hocker v. Walsh*, 22 F.3d 995 (10th Cir.1994) is instructive.  In *Hocker*, Hocker was placed in a detention center while intoxicated and at times incoherent or "would not wake up." 22 F.3d at 997.  Two days later, she was discovered dead in her cell, having hung herself from the upper bunk.  *Id.*  Plaintiffs argued that the detention center's policy of admitting intoxicated and unconscious individuals showed deliberate indifference, but that argument was "flawed."  *Id.* at 998.  Instead, we concluded that the plaintiffs were required to show that defendants were deliberately indifferent to the specific risk of suicide, and not merely to the risk of intoxication.  *Id.* at 1000.  In the case before us, the defendants must subjectively disregard the risk of [the] claimed harm – death and heart attack – and not merely the risks of intoxication.

*Martinez*, 563 F.3d at 1089-90.

The subjective component can be met by showing that the risk of suicide was "obvious," though that threshold is "very high."

> The [*Farmer*] Court made clear that the defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence "that the risk was obvious."  *Id.* at 842. However, the threshold for obviousness is very high.  *See, e.g., Perez v. Oakland County*, 466 F.3d 416, 435-36 (6th Cir. 2006) (Griffin, J., concurring) ("Admittedly, it may have been unwise to credit Perez's characterization of his state of mind and his explanation for

4

> discontinuing his medication, particularly in light of his history and
> his unmedicated state itself. . . . [However, i]f one fails to perceive
> a strong likelihood, one cannot then be deliberately indifferent to
> it."); Collins [v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006)] ("[A]
> request to see a crisis counselor . . . is not sufficient to put a
> defendant on notice that an inmate poses a substantial and
> imminent risk of suicide.").

Gaston I, 229 Fed. App'x at 710; see also Gaston II, 297 Fed. App'x at 742 (quoting same from
Gaston I).

An individual defendant, however, may be entitled to qualified immunity. "This defense
shields government officials performing discretionary functions from liability" if either of a two-
part inquiry is established – (1) the conduct "does not violate clearly established rights" (2) "of
which a reasonable government official would have known." Graves v. Thomas, 450 F.3d
1215,1218 (10th Cir. 2006) (internal quotations and citation omitted). Under present standards,
the Court may address either prong first. See, e.g., Green v. Post, 574 F.3d 1294, 1299 (10th Cir.
2009) (citing Pearson v. Callahan, ___ U.S. ___, ___, 129 S. Ct. 808, 812 (2009)).

Finally, a municipality may be held liable when its policy or custom constituting
deliberate indifference caused the attempted suicide. See, e.g., Darr v. Town of Telluride, 495
F.3d 1243, 1256-57 (10th Cir. 2007) (discussing different alternatives for proving a policy or
custom); see also, e.g., Boyett v. County of Washington, 282 Fed. App'x 667, 682 (10th Cir. 2008)
("Nor do any of the Plaintiffs' allegations, even if true, point to a policy of deliberate indifference
to Boyett's serious medical needs."). Conversely, a municipality cannot be held liable if there is a

> lack of a constitutional violation by any of the county's employees.
> Without proof of an underlying constitutional violation by a
> county employee, there can be no county liability based on a
> county policy. See City of Los Angeles v. Heller, 475 U.S. 796, 799
> (1986) (per curiam) ("If a person has suffered no constitutional
> injury at the hands of the individual police officer, the fact that the

> departmental regulations might have authorized the use of
> constitutionally excessive force is quite beside the point."); *Estate
> of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1264 (10th Cir.
> 2008) ("[W]ithout the predicate constitutional harm inflicted by
> an officer, no municipal liability exists.").

*Boyett,* 282 Fed. App'x at 682.

## The Artesia Defendants

Plaintiffs' theories of relief against Officer Martinez and the City of Artesia relate to two

alleged policies – one written and the other unwritten.

I.  The Written "Transport" Policy Regarding Inmates with Medical Needs

The Artesia Defendants' motion attaches documents regarding transport of ill inmates

from the Artesia Police Department "Standard Operating Procedures Manual" and the actual

forms Officer Martinez completed in this case.  *See Doc. 74-3* (affidavit certifying copies of the

Procedurals Manual); *Doc. 74* at 2 (citing Exhibits D-1, D-2, and E).  And, there is no dispute

that these exhibits constitute the City's written transport policy.  *See, e.g.,g Doc. 74* at 15 ("The

City's policy was to transport . . . .  By Personnel Order from the Chief of Police . . . .  This policy

was properly implemented in this case in order to ensure Gutierrez's safety and does not reflect

an unconstitutional policy."); *Darr,* 495 F.3d at 1256 ("A plaintiff may prove the existence of an

official policy or custom in at least five ways: . . . (2) an official policy exists when the municipal

board or agency exercises authority delegated to it by a municipal legislative body").

Exhibit D-1 is the "prisoner care" memorandum from Artesia Police Chief Don Raley

dated March 19, 2007.  It provides, in pertinent part, that:

> Effective immediately we will discontinue the practice of having
> the Artesia Fire Department examine all prisoners booked into our
> facility.  The exams conducted over the past several weeks did not
> reveal the need for continuation of this level of medical staffing.

> All sworn officers and detention officers are reminded that *they are to immediately seek medical assistance for any prisoner they believe has medical needs* at any point during their time in custody at the Artesia Police Department.
>
> In order to better ensure the safety of those prisoners who may present themselves in higher risk category we *will transport prisoners falling within the below listed categories within four hours of booking:*
>
>                             \* \* \* \*
>
>     !   Inmates known to, or believed to, have clinically recognized mental health issues
>     !   Inmates who are suicidal.

*Doc. 74-5* (emphasis added).

Chapter 5, Section 1 of the Manual addresses Artesia "Detention Facility" matters.

*Doc. 74-6 (Exhibit D-2)*. The subsection entitled "Commitments" provides that "the Detention Officer should ensure [the] individual is appropriate for commitment (i.e., not intoxicated, etc.)" and that, "[i]f the individual is not appropriate for commitment, the Detention Officer shall refuse the individual and immediately contact his/her immediate supervisor." *Doc. 74-6*.

Exhibit E consists of the "Artesia City Jail Booking Medical And Mental Health Screening Report" that Officer Martinez filled out and that both he and Gutierrez signed. Portions of the form, in bold and emphasized language, provide:

> ➜ **If this person needs immediate care, CALL 911 Now!**
>
> **O**bserve this person as they enter the jail.
>
> **A**sk this person about their medical condition
>
> **T**alk to the arresting officer about this person
>
> **D**ecide if this person is "OK" for jail custody
>
>     ➜ **If this person is not "OK" for jail custody (check one):**
>         [   ] EMERGENCY SITUATION – CALL 911 NOW!
>         [   ] QUESTIONABLE CONDITIONS – complete a
>             jail "Medical Rejection Form," Give it to the

officer and tell the officer to take this person to
a medical practitioner for exam before custody.

Interview this person, once accepted for custody

Remember:  OATDI . . . Now go to Page 2 . . .
OBSERVE THIS PERSON AS THEY ENTER THE JAIL: . . .
ASK THIS PERSON ABOUT THEIR MEDICAL CONDITION: . . .
TALK TO THE ARRESTING OFFICER ABOUT THIS PERSON: . . .
DECIDE IF THIS PERSON IS "OK" FOR JAIL CUSTODY: . . .
INTERVIEW THIS PERSON, ONCE ACCEPTED FOR CUSTODY

*Doc. 74-7* (certain original emphasis deleted for clarity).  Under each of "OATDI" factors on

Pages 2-3 of the form are many more detailed questions to assist the booking officer for

appropriate screening and determination of proper transport and placement.

In the present case, the undisputed sequence of events begins with Gutierrez' arrest on

the evening of Thursday, May 22, 2008.  *See, e.g., Doc. 122* at ¶ 21.  He was taken to the Artesia

Police Department, which has "only eight cells, so it's pretty small."  *Doc. 102-2* at 2.  There

Officer Martinez interviewed Gutierrez after his arrest and did not note on Exhibit E above that

there was an "emergency situation" requiring him to call 911, or a "questionable condition"

requiring him to "take this person to a medical practitioner for exam before custody."  *Doc. 74-7*

at 1.  Officer Martinez instead checked "no" to all of the questions pertaining to acute medical

conditions such as unconsciousness, bleeding from wounds or ears, unresponsive pupils, trauma,

vomiting, sweating, fever, swelling, jaundice, infection or abnormal speech.

On the form, Officer Martinez did indicate that Gutierrez had been jailed previously,

currently had "mental health problems" and was "ill, injured, or having other medical problems."

Most importantly, Officer Martinez specifically noted that Gutierrez had recently been depressed

and had thought about suicide that very day.  *Id.* at 2.  In addition, after talking to the arresting officer about Gutierrez' demeanor, he further noted that he was "concerned about [Gutierrez'] welfare or jail custody" because he was "suicidal."  *Id.*

Because of the lack of any acute, immediate need for medical care, Officer Martinez determined that Gutierrez was suitable for jail custody but decided that the small Artesia Jail was an inappropriate placement.  Instead he opted to transport Gutierrez to ECDC, about a  forty-five minute drive from the Artesia Police Department.  ECDC was specifically chosen by Officer Martinez because Gutierrez was depressed, bipolar and suicidal and had spent a week in Sunrise (a local mental health facility), and the officer specifically noted <u>all</u> of this information on the form he delivered to the ECDC facility.  *Id.*  Officer Martinez felt that ECDC was better equipped to handle suicidal inmates, as it is a much larger detention facility and has housed and cared for mentally ill inmates in the past.[2]  The ECDC capabilities include the ability to put mentally ill inmates in the protective custody unit, where, in fact, Gutierrez had been classified and housed during a previous stay at ECDC just weeks before the arrest at issue.  *See e.g., Doc. 122* at ¶ 37; *Doc. 128* at ¶ 21; *Doc. 59* at 4-5.  Officer Martinez also indicated on the form that Gutierrez' behavior suggested a "risk of assault while in the jail custody" and that Gutierrez would

---

[2]   In the first round of briefing on summary judgment, Plaintiffs' "preliminary statement" provides that ECDC

> is a regional jail which accepts inmates from surrounding Eddy County.  Eddy County's primary population centers, Carlsbad, Artesia, and Loving, have limited facilities and refer complicated cases to the ECDC.  Among the types of inmates accepted at ECDC are those who are suicidal.  The ECDC facility is equipped to handle suicidal inmates.  It has cells designed for observation, holds up to 200 inmates, and has nurses on staff.

*Doc. 47* at 2.  ECDC did not object to this characterization at the time, *see Doc. 54,* and this also has been the Court's understanding of ECDC's capabilities throughout these proceedings.

"require ongoing observation." *Doc. 74-7 at 3*.[3]

Plaintiffs argue that by not taking him to a mental health facility when he knew Gutierrez had expressed feelings of depression and suicidal ideation that day, Officer Martinez disregarded this written policy and thus acted with "deliberate indifference" to a serious medical need. *See Doc. 102* at 16–17. Defendants contend that the written policy (the prisoner care memorandum – Exh. D-1) directed transportation of Gutierrez to ECDC. *See Doc. 74* at 3 ("By Personnel Order from the Chief of Police, detention staff is required to . . . transport 'those prisoners who may present themselves in higher risk categories . . .' to the Eddy County Detention Center."). However, a careful reading of that written policy shows that it simply directs transport of high risk prisoners within four hours of booking but makes no reference to the appropriate destination. *Doc. 74-5*.

Even so, Plaintiffs maintain that armed with the information he had gleaned from his interview of Gutierrez, Officer Martinez was required by that policy to transport Gutierrez to a mental health facility rather than ECDC. Plaintiffs dismiss as irrelevant that Gutierrez was not then exhibiting signs of threatened or active suicide. *See Doc. 102* at 16-17. However, I agree with the reasons the Artesia Defendants raise for entry of summary judgment in their favor and incorporate those arguments herein.

The undisputed evidence establishes no indication of a significant risk that would have mandated immediate transport to a mental health facility for examination and observation. The undisputed facts show that Gutierrez was not acutely ill at the time of transport, and he was able

---

[3] As to Gutierrez' medications, Officer Martinez listed an asthma inhaler, Depakote ER 500 MG , Trazadone 50 MG, and Effexor XR 75 MG. *Id.*

to relate information about his mental health diagnosis, background and medications such that transport to ECDC was deemed the appropriate course for Officer Martinez to take under the policy.   Indeed, Gutierrez was incarcerated in the general population at ECDC for *three days* prior to attempting to commit suicide.  *See Doc. 74* at 14; *Doc. 102* at 8, 11.  Under the undisputed circumstances outlined above, no reasonable juror could find Officer's Martinez' decision to transport Gutierrez to ECDC rather than a mental health facility to constitute deliberate indifference to a medical need, nor does any clearly established law preclude entitlement to qualified immunity for his actions.

*II.  The Artesia Defendants' Unwritten "Customary" Transfer Policy*

A municipal "custom" that causes an constitutional violation can be another avenue for imposing municipal liability.  *Darr,* 495 F.3d at 1257.  Plaintiffs concede that the Artesia usually transported its mentally ill inmates to ECDC and that ECDC has superior capabilities to handle their care.  Rather, the heart of Plaintiffs' second theory lies in an alleged unwritten "custom" of Artesia police officers "falsifying screening reports and intake forms" with allegations of suicide to "compel [ECDC] . . . to accept inmates that Artesia did not want."  *Doc. 102* at 12.  Plaintiffs argue that the alleged custom itself constitutes "deliberate indifference" because the "net result is that Artesia's screening forms became effectively worthless to ECDC intake officers."  *Doc. 102* at 12.

For this proposition, Plaintiffs rely solely on the testimony of Sergeant Denninger to show such a custom.  *See id.* at 5 ("If Sergeant Denninger's testimony is deemed credible, Artesia 'procedure' is to declare any inmate they wish to leave the Artesia jail as 'suicidal,' regardless of whether the inmate actually is.").  Defendants adamantly deny that such a custom exists and

question the foundation for Sergeant Denninger's testimony, as do I.  *See Doc. 106* at 4

("Plaintiffs must support their claim with more than conjecture and speculation.  *Boyett v. Co. of*

*Washington*, 282 Fed Appx. 667, 679 (10th Cir. 2008).").  Sergeant Denninger testified in her

deposition that "90 %" of Artesia's inmates who were transported to ECDC and identified as

suicidal by transporting officers denied suicidal thoughts when she questioned them individually.

Such an observation amounts to little more than mere speculation that such a policy existed.

Finally, Plaintiffs do not contend that Officer Martinez followed such a custom on this or

any other occasion.  Instead, they maintain that because of the alleged  "custom" of  Artesia

officers misrepresenting its detainees as suicidal on their screening reports to force ECDC's hand,

Officer Martinez acted with "deliberate indifference" by not advising ECDC that Gutierrez was

"*really* suicidal."  In other words, he should have said to Sergeant Denninger:  "no, really, we're

not crying wolf this time."  *See Doc. 102* at 2, 15-16.[4]

---

[4]    Even assuming that Plaintiffs could demonstrate that Artesia had a custom of falsely
identifying inmates as suicidal, it would appear that the link would be too attenuated to hold Artesia
liable.  It is long and well-settled that showing proximate cause is one of the essential elements of a suit
under § 1983.

> As a quasi-tort action, a showing of proximate cause is one of the
> requirements.  This court has recognized that it is a requirement in
> *McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979).  The cases have
> generally recognized to the extent that the question has come up, that
> proximate cause is an essential aspect of the § 1983 action. . . . .  We are
> not speaking merely to factual cause, rather our reference is to legal
> causation which goes to relationship to the injury and consequent
> liability. . . .   The Supreme Court . . . recognized that the tort rules
> defining elements of damages and the prerequisites for the recovery of
> damages provide the appropriate starting point for the inquiry under §
> 1983 as well.

*Daniels v. Gilbreath*, 668 F.2d 477, 480-81 (10th Cir. 1982).  Plaintiffs would thus bear the burden of
showing the causal connection between Officer Martinez' decision to not emphasize in some fashion that
his report was accurate, and Gutierrez' subsequent suicide attempt:

Moreover, there is evidence that Officer Martinez went beyond providing the report to ECDC and orally advised ECDC staff of Gutierrez' suicidal thought.

> Officer Martinez believes that "more likely than not" he pulled Sergeant Denninger aside and told her about the suicide risk "because I've done it on every transport."  [Sergeant] Denninger simply testified that she doesn't remember Officer Martinez telling her about this risk.

*Doc. 59.* at 4-5.  Yet even if the officer's failure to emphasize the truth of his statements could somehow constitute deliberate indifference, no established case law could have alerted him that his actions violated Gutierrez' constitutional rights.  Both the City and Officer Martinez are entitled to judgment as a matter of law on the constitutional claims.

As to the state law claims for bodily injury and loss of consortium, I am persuaded that Plaintiffs have come forward with no admissible evidence that could support a claim under a waiver of sovereign immunity under either § 41-4-12 or § 41–4-9 of the New Mexico Tort Claims Act.  Therefore, summary judgment will be entered for the Artesia Defendants on those claims as well.

---

> Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation."  *Williams v. Bennett,* 689 F.2d 1370, 1380 (11th Cir. 1982) [, *cert. denied,* 464 U.S. 932 (1983)].  The relevant inquiry is "whether an official's acts or omissions were the cause – not merely a contributing factor – of the constitutionally infirm condition." *LaMarca,* 995 F.2d at 1538.  However, "[i]f a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries that arose from that condition."  *Id.* (internal quotation marks omitted).

*Tafoya v. Salazar,* 516 F.3d 912, 922 (10th Cir. 2008).  None of the parties have addressed this proximate cause element in their briefs, however.

*The Eddy County Defendants*

I have already held that as to Defendant Denninger, Plaintiffs have come forward with sufficient evidence from which a reasonable juror could find that Sergeant Denninger was both aware of facts from which the inference of a substantial suicide risk could be drawn and that the inference was indeed drawn.   *Doc. 59* at 4.  I concluded that "viewing the evidence in the light most favorable to the non-movant," Sergeant Denninger is not entitled to qualified immunity.

Since that ruling, Plaintiffs have amended to bring claims against other individual Eddy County Defendants –  Nurse Rhonda Bryant and Detention Officers Shirley Rodriguez and Miguel Juare – alleging that they, too, were deliberately indifferent to the medical needs of Gutierrez.  Each of these defendants has moved for summary judgment on the basis of qualified immunity.

As to all three of these defendants, each has filed an affidavit, the crux of which states: "I simply was not aware of any facts that actually indicated to me that there was a substantial risk that Augustine Gutierrez would attempt to hang himself." *Doc. 112* at 19, ¶6 (Jaure), at 22, ¶6 (Rodriguez) and at 26, ¶9 (Bryant).  Relying on this affidavit testimony, these defendants maintain that Plaintiffs have come forward with no contrary evidence as to the subjective component of "deliberate indifference."

But as discussed earlier, on this motion for summary judgment I must look at all of the evidence in the light most favorable to Plaintiff.  In that light, I must determine if they have come forward with admissible evidence from which a reasonable juror could find by a preponderance of the evidence that a "prison official subjectively knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious.'"  *Martinez,* 563

F.3d at 1089-90 (quoting *Farmer,* 511 U.S. at 842).  Even if the evidence could support a finding

of an obvious risk, it does not <u>conclusively</u> establish an inference that the official subjectively

knew of the substantial risk of harm, however, because "a prison official may show that the

obvious escaped him."  *Farmer*, 511 at 843 n. 8.  In other words, the ultimate factfinder could

believe a defendant's testimony that she failed to actually recognize the obvious risk and find her

not liable for a constitutional violation.

In analyzing the evidence submitted by Plaintiffs as to the obviousness of a risk of

attempted suicide, I note that Plaintiffs have come forth with "alternative" factual scenarios

based upon the individual defendants' deposition testimony.  In one scenario based upon Nurse

Bryant's testimony, Gutierrez abruptly refused to take his psychiatric medications on the day of

the suicide attempt.  On the version grounded on the testimony of the detention guards,

Gutierrez repeatedly requested his medications that day but they were not supplied by Nurse

Bryant nor did he receive any visit from the medical staff.  There is no dispute, however, that all

three individual defendants had been employed at the facility when Gutierrez had been held in

custody at ECDC just weeks before the more detention at issue.  On that occasion, he had been

placed in the Kappa Unit for protection "due to mental problems."

As to Nurse Bryant, Plaintiffs contend that she was deliberately indifferent because she

was aware of the medications Gutierrez was to be taking, knew that they were psychiatric

medications and that Gutierrez was bipolar, knew the ECDC 72-hour mental health evaluation

had not yet occurred, and did nothing when informed that he refused his medication the day he

attempted suicide.  She admits that she knew that Gutierrez had spent a week at the Sunrise

mental health institution, but denies in her affidavit and deposition testimony that she was ever

told or aware that he was suicidal.

Plaintiffs also have come forward with evidence that detention officers were deliberately indifferent that morning because they were aware of a generalized risk of inmates hurting themselves,[5] that Gutierrez was taking medications for depression and bipolar disorder, that he was repeatedly requesting his medication, and that Nurse Bryant did not have the medications for him.  Nevertheless, Plaintiffs have presented uncontroverted evidence that Gutierrez was placed in one of the most remote cells where he could not be seen by the officers unless they walked down the hall to it.  It is further undisputed that the detention officers willfully failed to conduct their required thirty minute rounds which are designed in part to ensure inmate safety, including preventing inmates from hurting themselves.  Moreover, upon finding Gutierrez hanging in his cell, Officer Rodriguez admits that she falsified the log book to make it appear that the mandated security rounds had been performed.  Certainly a jury could conclude that the falsification of the records indicates a subjective consciousness of obvious risk prior to the incident.

The Eddy County Defendants counter with defendants' affidavit testimony that none of them had "actual knowledge that Augustine Gutierrez was at risk for hanging himself."  For the moment I will overlook the potential issue whether these post-deposition affidavits should be

---

[5] Defendants assert that prison suicide is not "an endemic problem" and, as such, they cannot be held liable for deliberate indifference to a problem that they "should" have recognized. *See Doc. 129* at 2.  They cite no authority, much less controlling authority for this proposition and I have found none.  In fact, under the *Tafoya v. Salazar* decision above, it appears that the "endemic" nature of a pervasive dangerous situation is relevant to the proximate cause issue. *See* 516 F.3d at 922.  Moreover, as *Gaston* decision observed, the *Farmer* decision "made clear that the defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence "that the risk was obvious."  *Gaston I,* 229 Fed. App'x at 710.

stricken as an attempt to create a "sham" issue.  *See, e.g., Burns v. Bd. of County Comm'rs of Jackson County,* 330 F.3d 1275, 1282 (10th Cir. 2003).  That is because I find that the evidence, when viewed in the light most favorable to Plaintiffs, could support a finding that the risk of attempted suicide as to Gutierrez was so obvious that the defendants did make the connection. That awareness followed by wholly ignoring the prisoner by not providing his psychiatric medication or personally evaluating him or by willfully failing to performing required and routine security checks without any justification could be considered intentional disregard of that risk.

Wherefore,

IT IS HEREBY ORDERED AS FOLLOWS:

1. The Artesia Defendants' motion for summary judgment *(Doc. 74)* is GRANTED; and

2. The Eddy County Defendants' motion for summary judgment on the basis of qualified immunity *(Doc. 112)* is DENIED.

_____
UNITED STATES MAGISTRATE JUDGE

17